DARYISE L. EARL,

                      Plaintiff,

v.                                                        Case No. 23-cv-1017-pp

JENNIFER MCDERMOTT, *et al.*,

                      Defendants.

**ORDER SCREENING AMENDED COMPLAINT UNDER 28 U.S.C. §1915A**

       On March 8, 2024, the court screened plaintiff Daryise L. Earl's *pro se* complaint under 42 U.S.C. §1983 and determined that it failed to state a claim for relief. Dkt. No. 12. The court explained that the complaint broadly alleged that in September 2020, the defendants failed to institute appropriate safeguards to stop the spread of COVID-19, but it did not allege how their actions directly affected the plaintiff. Id. at 13–16. The court gave the plaintiff an opportunity to file an amended complaint correcting the deficiencies and better explaining his claims. Id. at 16–17. On June 17, 2024, after the court had given the plaintiff three extensions of time to amend, the court received the plaintiff's amended complaint. Dkt. No. 19. This decision screens the amended complaint.

**I.    Screening the Amended Complaint**

      A.    <u>Federal Screening Standard</u>

       As the court explained in the previous order, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief

may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the amended complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, the amended complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The amended complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.   The Plaintiff's Allegations

The amended complaint names the same defendants as the original complaint: Kettle Moraine Correctional Institution (KMCI) Warden Jennifer McDermott, KMCI medical employee John Gliniecki and eighty John or Jane Doe defendants grouped into four sets of twenty defendants. Dkt. No. 19 at ¶¶3–8. The amended complaint again sues all defendants except Does 61 through 80 in their individual and official capacities. Id.

The amended complaint provides the same background information about the COVID-19 pandemic as the original complaint, including what the plaintiff says are the March 2020 CDC guidelines for quarantining incarcerated persons believed to be close contacts of a known or suspected case of COVID-19. Id. at ¶¶9–17. The plaintiff says that before September 3, 2020, KMCI officials followed CDC Guidelines, including the recommended quarantine period of fourteen days. Id. at ¶¶18–22. He alleges that on September 3, 2020, six incarcerated persons on Unit 11 tested positive for COVID-19. Id. at ¶23. KMCI staff quarantined those persons but did not quarantine the roommates of those six persons, who remained free to use the restrooms, showers, recreation and school areas in Unit 11. Id. at ¶¶24–26.

The plaintiff alleges that on September 4, 2020, "other prisoners" in Unit 11 began to complain to KMCI staff of COVID-19 symptoms. Id. at ¶27. He says that Does 41 through 80 told those incarcerated persons "to remain in their cells." Id. at ¶28. The plaintiff alleges that Roger Edwards, who was housed on Unit 11, was a roommate of one of the persons who tested positive for COVID-19. Id. at ¶29. On September 4, 2020, Edwards allegedly told Does 41 through 80 that he was suffering from possible COVID-19 symptoms. Id. at ¶30. The plaintiff alleges that defendant Gliniecki and Does 41 through 60

received a request from Edwards to be retested for COVID-19, but Gliniecki refused that request and told Edwards "to remain in his cell for six days." Id. at ¶¶32–35. He says Edwards still was permitted to use the showers and restrooms that other, non-quarantined incarcerated persons could use. Id. at ¶37. Edwards complained about his symptoms again three days later and again requested retesting. Id. at ¶40. Medical staff did not retest Edwards, and he was allowed to come off quarantine and rejoin the general population only six days after complaining about his symptoms. Id. at ¶41.

The plaintiff alleges that in September 2020, Unit 11 and Unit 9 had a shared recreation area and recreation periods, during which persons incarcerated in both units could use the institution's exercise equipment. Id. at ¶42. The plaintiff says he exercised with incarcerated person Frank Burt, and they "at times were in the same rotation line to use the weights that were also being used by Edwards and [incarcerated person] Shannon Dertz," who exercised together. Id. at ¶¶44–45. He says he and Dertz both were housed on Unit 9. Id. at ¶46.

The plaintiff alleges that because of "complaints from KMCI's staff and prisoners," the defendants "were compelled to test all of the Unit-11 prisoners for COVID on September 14, 2020." Id. at ¶49. Two days later, the defendants "were compelled to inform thirty-eight Unit-11 prisoners that they had tested positive for COVID." Id. at ¶50. The plaintiff alleges that Edwards and Burt were among those persons who tested positive. Id. at ¶51.

The plaintiff says that around September 19, 2020, all defendants "received notification" that Dertz and other Unit 9 incarcerated persons were complaining of suffering symptoms often associated with COVID-19. Id. at ¶52. The next day, Gliniecki and Does 41 through 80 told Dertz and "several other"

4

persons on Unit 9 to "remain in their cells." Id. at ¶53. The plaintiff says those incarcerated persons still were allowed to use the same showers and restrooms used by persons not on cell confinement status. Id. at ¶55. The plaintiff alleges that he was "a Unit-9 prisoner worker" and had conversations with Dertz from September 20 to 29, 2020. Id. at ¶¶56–57. He says that he "was never notified" that Dertz and other persons incarcerated on Unit 9 were suffering from COVID-19 symptoms. Id. at ¶58.

The plaintiff alleges that KMCI eventually retested the entire prison population for COVID-19, and that around 800 incarcerated persons tested positive. Id. at ¶¶59–60. The plaintiff alleges that he experienced COVID-19 symptoms "[s]everal days before the mass COVID testing occurred," and that on September 29, 2020, medical staff informed him that he had tested positive. Id. at ¶¶61–62. He alleges that over the next ten days, he suffered from hot and cold flashes, loss of taste and smell, weight loss and "a harsh cough." Id. at ¶63.

The plaintiff asserts that all defendants "were responsible for creating the policy/custom that was in place at KMCI between September 2, 2020 thru September 29, 2020, that refused to test the prisoners who complained of suffering from COVID symptoms." Id. at ¶47. He says the defendants based this policy "on a strategy to not have to report to State officials the widespread confirmed positive cases of COVID amongst KMCI's prisoners." Id. at ¶48. He alleges that all defendants "either issued orders, or followed explicit instructions, to not test or quarantine the Unit-9 prisoners who made complains of suffering from COVID symptoms." Id. at ¶54. He says this practice continued from September 2 through 29, 2020, and "lead [*sic*] to the

5

medical staff refusal to test KMCI's prisoners who complained of suffering from COVID." Id. at ¶64.

The plaintiff asserts that Warden McDermott "made a conscious decision to either implement the custom, or condone the practice" of refusing to test incarcerated persons complaining of suffering from COVID-19 symptoms "as a means to circumvent KMC's obligation to report to State health officials any/all cases of COVID." Id. at 9–10. He alleges that McDermott's "utter disregard of the severity of COVID" led the plaintiff to "unknowingly mingle with prisoners" that McDermott knew had symptoms of COVID-19. Id. at 10. He says her practices departed from the known CDC and KMCI guidelines for testing and quarantining incarcerated persons suffering from COVID-19 symptoms and "caused [the plaintiff] to contract COVID from being confined within the same Unit as sick prisoners." Id.

The plaintiff asserts that defendant Gliniecki "condoned, as well as turned a blind eye to," KMCI's failure to test and quarantine incarcerated persons complaining of COVID-19 symptoms. Id. at 11. He alleges that this led to sick persons (like Edwards) congregating with incarcerated persons in Unit 9 (where the plaintiff was housed). Id. He asserts that the September 2020 COVID outbreak in his housing unit "can be linked to" sick persons like Dertz interacting with others on Unit 11 (where Edwards was housed). Id. He says that even "upon being notified of the prisoners from [the plaintiff's] complaints—of suffering from COVID symptoms," Gliniecki "once again actively participated in the scheme the Defendants concocted to sidestep having to report the extent of KMCI's COVID crisis" by not testing or quarantining sick persons. Id.

The plaintiff asserts that Does 1 through 20 "were the architects behind the policies and procedures" of not testing or quarantining incarcerated

persons who complained of suffering from COVID-19 symptoms. Id. at 12. He says these Does knew that the policy would allow sick persons like Edwards "to mingle with [the plaintiff's] Unit without first being tested" or forced to quarantine for fourteen days. Id. He asserts that once KMCI discovered the outbreak of COVID-19 cases, these Does maintained the harmful policy or practice of not testing or quarantining sick persons. Id. The plaintiff says this "ultimately caused [him] to contract COVID." Id.

The plaintiff alleges that Does 21 through 40 "engaged in a course of action that enforced a custom amongst KMCI's staff" of not testing incarcerated persons complaining of COVID-19 symptoms. Id. at 13–14. He says these Does "either actively participated, or turned a blind eye, to the enforcement of the practice," which ultimately led to the plaintiff contracting COVID-19. Id.

The plaintiff asserts that Does 41 through 60 were medical professionals who "either took part in the creation of, or cast a blind eye towards, the customs that were implemented to not test or quarantine the Unit-11 and 9 prisoners" who complained of suffering from COVID-19 symptoms. Id. at 14. He says these Does "participated in a clandestine plot that was designed to circumvent KMCI's obligation to report to State officials the COVID crisis that had developed within KMCI." Id.

Finally, the plaintiff asserts that Does 60 through 80 knew that persons incarcerated in Unit 11 had complained of suffering from COVID-19 symptoms and that staff were not testing or quarantining those persons. Id. at 15. He says that the Does "either ordered, or approved, the joint recreational periods that condone[d] the mingling of the contagious prisoners from Unit-11 with [the plaintiff's] Unit." Id. He says those Does failed to modify their policy after the prison learned of the COVID-19 outbreak "or alert State officials of the

Defendants COVID concealment scheme." Id. at 15–16. The plaintiff alleges that these Does "played an intricate role in the creation of the hazardous conditions of confinement that intentionally exposed [the plaintiff] to prisoners who the Defendants were fully aware were suffering from COVID symptoms." Id. at 16.

The plaintiff seeks $150,000 in punitive and compensatory damages against each defendant and "any additional relief deemed relevant." Id. at 18.

C. Analysis

As the court explained in its March 8, 2024 order screening the original complaint, the court analyzes the plaintiff's allegations challenging the conditions of his confinement under the Eighth Amendment. Dkt. No. 12 at 8. The court explained that "a state may not subject incarcerated persons 'to conditions of confinement amounting to cruel and unusual punishment.'" Id. (quoting Giles v. Godinez, 914 F.3d 1040, 1051 (7th Cir. 2019); and citing Rhodes v. Chapman, 452 U.S. 337, 345–47 (1981)). Only "extreme deprivations" may amount to cruel and unusual conditions of confinement, and the court must judge the alleged conditions "in accordance with contemporary standards of decency." Giles, 914 F.3d at 1051 (citing Hudson v. McMillian, 503 U.S. 1, 8–9 (1992); and Rhodes, 452 U.S. at 346).

An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of a conditions-of-confinement claim, an incarcerated person must show that he has been deprived of "'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes, 452 U.S. at 347). The subjective component requires the plaintiff to demonstrate that prison officials acted with the requisite intent, that is, that the officials acted with

8
Case 2:23-cv-01017-PP   Filed 07/23/24   Page 8 of 13   Document 20

"deliberate indifference" to a substantial risk that the plaintiff would suffer serious harm. Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 303.

Like the original complaint, the amended complaint consists mostly of general allegations about KMCI's response to the COVID-19 pandemic in September 2020. The plaintiff again alleges that KMCI officials "tested incarcerated persons complaining of symptoms, quarantined persons who tested positive for COVID19, instructed others with COVID-19 symptoms to remain in their cells except for limited exceptions and at least twice performed mass testing of all persons incarcerated at KMCI." Dkt. No. 12 at 13. He alleges that the defendants later abandoned those policies and collectively created, condoned and/or enforced a policy of not testing or quarantining incarcerated persons who complained of experiencing COVID-19 symptoms. He alleges that the defendants allowed these ill persons to interact with others on other units through shared showers and restrooms, exercise areas and community spaces. He says this led to the outbreak of COVID-19 at KMCI, and he alleges that he is one of the over 800 persons who contracted COVID-19 in September 2020.

As the court explained in the March 8, 2024 screening order, the plaintiff's general allegations say "almost nothing about *his* experience or his situation at KMCI," instead describing "the experience of *other* incarcerated persons (Edwards and Dertz) to discuss what he believes were inadequate quarantine policies." Id. at 13–14. The amended complaint still does not allege that the plaintiff "contacted any defendant about symptoms he was experiencing" or that any defendant "had any interaction with the plaintiff." Id. at 13–14.

Unlike the original complaint, however, the amended complaint newly alleges that the plaintiff exercised with a person incarcerated on Unit 11 (Burt),

9

where Edwards was housed when he became ill. The plaintiff does not allege that Burt was ill when the plaintiff exercised with him. He realleges that Edwards exercised with Dertz, who was housed on Unit 9 with the plaintiff. He newly alleges that Edwards *and* Burt were among the thirty-eight persons who tested positive for COVID-19 on September 16, 2020, and whom the defendants told to remain in their cells. But he alleges that they still accessed shared showers and restrooms. The plaintiff also newly alleges that between September 20 and 29, 2020, he spoke with Dertz (who had tested positive for COVID-19) without knowing that Dertz had tested positive. The plaintiff says he began to feel ill a few days later, and that he was one of the over 800 persons who tested positive after the second mass testing in late September 2020.

The amended complaint also newly alleges that Warden McDermott, Gliniecki and the Doe defendants implemented or condoned the policy of not testing and not quarantining sick persons to avoid having to report KMCI's positive COVID-19 tests to state officials. If true, this would suggest that the defendants were not merely negligent in the COVID-19 policies that they implemented at the prison but intentionally disregarded the risk that the policies would create to incarcerated persons for the purpose of avoiding their duty to report active COVID-19 cases. Although the defendants' negligence in implementing policies during the COVID-19 pandemic would not support an Eighth Amendment claim, see Williams, 2022 WL 17961667, at *4, an intentional disregard of "an excessive risk to inmate health or safety" would. Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011). The court will allow the plaintiff to proceed against McDermott and Gliniecki on this Eighth Amendment claim. The court advises the plaintiff that although it must accept

the allegations in the amended complaint as true for the purposes of screening, he will need to present evidence proving his allegations to survive a motion for summary judgment.

The court will not allow the plaintiff to proceed against the eighty Does for the same reasons it explained in the March 8 order. The court previously explained that "[a]lthough the plaintiff may use John or Jane Doe placeholders to identify persons whose names he does not know, he cannot use a Doe placeholder to identify a *group* of individuals or staff members named collectively as one defendant." Dkt. No. 12 at 15 (citing Cash v. Marion Cnty. Jail, 211 F. App'x 486, 488 (7th Cir. 2006); Gray v. Weber, 244 F. App'x 753, 754 (8th Cir. 2007)). In this respect, the amended complaint is identical to the original. The plaintiff identifies the same four groups of twenty Does each and seeks to hold each group jointly responsible for the same alleged action or inaction. The amended complaint does not explain how any of these defendants were *personally* involved in the alleged conduct, nor does it identify any *specific* conduct that violated the plaintiff's rights. See id. Some of the allegations in the amended complaint are even less specific about these defendants' conduct. *E.g.* Dkt. No. 19 at 14 (alleging that Does 21 through 40 "engaged in a course of action that enforced a custom amongst KMCI's staff to prevent the confirmation of the Unit-11 prisoners from being identified as being carriers of a contagious virus that is as dangerous as COVID"). As the court explained in the May 8 order, these vague allegations "that twenty (or eighty) unidentified persons acted identically and collectively" to violate the plaintiff's rights does not state a claim. Dkt. No. 12 at 15–16 (citing Brooks v. Ross, 578 F.3d 574, 580 (7th Cir. 2009)). Because the plaintiff did not correct these deficiencies (as the court advised him

to do in the March 8 order), the court will dismiss the Doe defendants and will not allow the plaintiff to proceed against these eighty unnamed persons.

The plaintiff also seeks to proceed against all defendants (except one group of twenty Doe defendants) in their official capacities. Claims against a state actor in his official capacity represent another way to plead an action against the entity that he represents or for which the official works. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)). The court construes the official capacity claims against the defendants as having been brought against the Wisconsin Department of Corrections, the agency for which they work. Id. at 165–66. And because claims against the Department of Corrections are "no different from a suit against the State itself," the court construes these claims as if brought against the State of Wisconsin. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Graham, 473 U.S. at 165–66; Monell, 436 U.S. at 690 n.55). But a state is not a "person" subject to suit for damages under §1983. See Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 617 (2002); Williams v. Wisconsin, 336 F.3d 576, 580 (7th Cir. 2003). The plaintiff seeks only damages, which are not available against the defendants in their official capacities, so the court will dismiss his official capacity claims.

In summary, the court will allow the plaintiff to proceed on Eighth Amendment claims against Warden McDermott and John Gliniecki in their individual capacities only. The court will dismiss the Doe defendants and the plaintiff's official capacity claims.

## II. Conclusion

The court **ORDERS** that John/Jane Does 1–80 are **DISMISSED**.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendants Jennifer McDermott and John Gliniecki. Under the informal service agreement, the court **ORDERS** those defendants to respond to the complaint within sixty days.

The court **ORDERS** that the parties may not begin discovery until after the court issues a scheduling order setting deadlines for completing discovery and filing dispositive motions.

Dated in Milwaukee, Wisconsin this 23rd day of July, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**